# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of: | ) |
| Thayer Wiederhorn | ) Case No.2:21-MJ-5413 |
| | ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A-4

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 15 U.S.C. §§ 78j, 78ff, and 17 C.F.R. § 240.10b-5; 18 U.S.C. §§ 1001; 1343; 1348; 1349; 1956; 1957; 26 U.S.C. §§ 7201; 7206(1); 7212 | See Attached Affidavit |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

/s/ by telephonic authorization

_____
*Applicant's signature*

Special Agent Nathaniel Cherney

_____
*FBI Special Agent Nathaniel Cherney*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: <u>Los Angeles, CA</u>

_____
*Hon. KAREN L. STEVENSON , United States Magistrate Judge*

AUSA: Adam P. Schleifer x4849

## ATTACHMENT A-4

### Person to be Searched

The person of THAYER WIEDERHORN ("THAYER") born June 4, 1988, with California driver's license number F3680622. THAYER's driver's licenses lists him as 6' with brown eyes and brown hair, weighing 165 pounds.  The search of THAYER shall include any and all clothing and personal belongings, digital devices, backpacks, wallets, briefcases, purses, and bags that are within WIEDERHORN's immediate vicinity and control at the location where the search warrant is executed.



## ATTACHMENT B

I. **ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, fruits, and instrumentalities of violations of 15 U.S.C. §§ 78j, 78ff, and 17 C.F.R. § 240.10b-5 (securities fraud); 18 U.S.C. §§ 1001 (false statements); 1343 (wire fraud); 1348 (securities fraud); 1349 (conspiracy to commit wire fraud and securities fraud); 1956 and 1957 (money laundering); 26 U.S.C. §§ 7201 (attempt to evade or defeat tax); 7206(1) (filing a false tax return); and 7212 (interference with administration of Internal Revenue laws) (collectively, the "SUBJECT OFFENSES"), namely:

      a.    Records, communications, documents, correspondence, programs, applications, or materials since January 2016 pertaining to any form of compensation or transfer of anything of value between Fat Brands, Inc ("FAT"); Fog Cutter Capital Group, Inc "FOG CUTTER"; or any of their predecessors or current or former affiliates (as set forth in Exhibit 1 to this Attachment) on the one hand, and WIEDERHORN, THAYER, or any of their current or former spouses, romantic partners, parents, children, siblings, or current or former in-laws on the other, as set forth in Exhibit 2 to this Attachment.

      b.    Records, documents, correspondence, programs, applications, or materials since January 2016 pertaining to financial disclosures as well as corporate combinations and mergers and acquisition activity by FAT, FOG CUTTER, and any of their predecessors or current or former affiliates as set forth in Exhibit 1 to this Attachment, including statements of assets,

i

liabilities, accounts receivable, and accounts payable, extensions or forgiveness of credit.

      c.   Records concerning the corporate structure, ownership, and governance of Fat Brands, Inc; Fatburger North America, Inc; Fog Cutter Capital Group, Inc; Fog Cap Development, LLC; and any other and any of their predecessors or current or former affiliates as set forth in Exhibit 1 to this Attachment including articles of incorporation, by-laws, share and dividend authorizations, board minutes, and any resolutions or proposed amendments concerning those items.

      d.   Records and communications pertaining to the Internal Revenue Service, the tax treatment of indebtedness, and the preparation, filing, payment, collection or evasion of taxes from the period January 1, 2016 to the present.

      e.   Records and communications pertaining to PayPal.

      f.   Documents, records, or other indicia of ownership, rental of, or residency within the SUBJECT PREMISES 1 and 2 as well as 585 F Street, Gearhart, Oregon 97138; 671 Wellington Street, Gearhart, Oregon 97138; and 1888 North Crescent Heights Boulevard, Los Angeles, California 90069 including leases, utility bills, identity documents, and mail.

      g.   Documents, keys, and any other entry or access devices for mailboxes, other mail receipt or storage facilities, storage units, cars, deposit boxes, buildings, and office spaces.

      h.   Records and communications pertaining to WIEDERHORN's and THAYER's financial assets and flows of funds or

other things of financial value to or from accounts owned or controlled by WIEDERHORN or THAYER including brokerage and financial institution statements, wire transfers, currency exchanges, deposit slips, cashiers' checks, and/or other financial documents related to depository bank accounts, lines of credit, credit card accounts, title or deeds to real estate, real estate mortgage initial purchase loans or loan refinances, residential property leases, escrow accounts, the purchase, sale, or leasing of automobiles or real estate, or auto loans, and investments, or showing or referring to purchases or transactions.

i.    Currency, jewelry, precious metals, jewelry and gems with a value in excess of $500, including the first $500 if more than $500 is found, and bitcoins and other digital currency, as well as related documents and programs.

j.    Souvenirs, receipts, photographs, records, and other evidence of travel and luxury purchases.

k.    Documents and records showing email and telephone contacts and calls made and received by WIEDERHORN and THAYER, such as SIM cards, address books, call histories, and telephone bills from January 1, 2016 to the present.

l.    Records and communications evidencing travel, including hotel, airline, car rental, public transportation, or ride-sharing services records purchased by WIEDERHORN, THAYER, and any authorized signatories associated with credit cards and bank accounts held in their name from January 1, 2016 to the present.

m.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

n.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and

manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

        viii.    records of or information about
Internet Protocol addresses used by the device;

        ix.  records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

2.  As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

3.  As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to

store digital data (excluding analog tapes such as VHS); and
security devices.

### 4. SEARCH PROCEDURES FOR HANDLING POTENTIALLY PRIVILEGED INFORMATION

4.   The following procedures will be followed at the time
of the search in order to avoid unnecessary disclosures of any
privileged attorney-client communications or work product:

Non-Digital Evidence

5.   Prior to reading any document or other piece of
evidence ("document") in its entirety, law enforcement personnel
conducting the investigation and search and other individuals
assisting law enforcement personnel in the search (the "Search
Team") will conduct a limited review of the document in order to
determine whether or not the document appears to contain or
refer to communications between an attorney, or to contain the
work product of an attorney, and any person ("potentially
privileged information").  If a Search Team member determines
that a document appears to contain potentially privileged
information, the Search Team member will not continue to review
the document and will immediately notify a member of the
"Privilege Review Team" (previously designated individual(s) not
participating in the investigation of the case).  The Search
Team will not further review any document that appears to
contain potentially privileged information until after the
Privilege Review Team has completed its review.

6.   In consultation with a Privilege Review Team Assistant
United States Attorney ("PRTAUSA"), if appropriate, the

Privilege Review Team member will then review any document identified as appearing to contain potentially privileged information to confirm that it contains potentially privileged information.  If it does not, it may be returned to the Search Team member.  If a member of the Privilege Review Team confirms that a document contains potentially privileged information, then the member will review only as much of the document as is necessary to determine whether or not the document is within the scope of the warrant.  Those documents which contain potentially privileged information but are not within the scope of the warrant will be set aside and will not be subject to further review or seizure absent subsequent authorization.  Those documents which contain potentially privileged information and are within the scope of the warrant will be seized and sealed together in an enclosure, the outer portion of which will be marked as containing potentially privileged information.  The Privilege Review Team member will also make sure that the locations where the documents containing potentially privileged information were seized have been documented.

7.   The seized documents containing potentially privileged information will be delivered to the United States Attorney's Office for further review by a PRTAUSA.  If that review reveals that a document does not contain potentially privileged information, or that an exception to the privilege applies, the document may be returned to the Search Team.  If appropriate based on review of particular documents, the PRTAUSA may apply to the court for a finding with respect to the particular

documents that no privilege, or an exception to the privilege, applies.

<u>Digital Evidence</u>

8.    The Search Team will search for digital devices capable of being used to facilitate the Subject Offenses or capable of containing data falling within the scope of the items to be seized.  The Privilege Review Team will then review the identified digital devices as set forth herein.  The Search Team will review only digital device data that has been released by the Privilege Review Team.

9.    The Privilege Review Team will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.

10.  The Privilege Review Team and the Search Team shall complete both stages of the search discussed herein as soon as is practicable but not to exceed 180 days from the date of execution of the warrant.  The government will not search the digital device(s) beyond this 180-day period without obtaining an extension of time order from the Court.

11.  The Search Team will provide the Privilege Review Team with a list of "privilege key words" to search for on the digital devices, to include specific words like "Robert Bernstein" or "Samuel Josephs" or their email addresses, and generic words such as "privileged" or "work product."  The Privilege Review Team will conduct an initial review of the data on the digital devices using the privilege key words, and by

using search protocols specifically chosen to identify documents or data containing potentially privileged information.  The Privilege Review Team may subject to this initial review all of the data contained in each digital device capable of containing any of the items to be seized.  Documents or data that are identified by this initial review as not potentially privileged may be given to the Search Team.

12.  Documents or data that the initial review identifies as potentially privileged will be reviewed by a Privilege Review Team member to confirm that they contain potentially privileged information.  Documents or data that are determined by this review not to be potentially privileged may be given to the Search Team.  Documents or data that are determined by this review to be potentially privileged will be given to the United States Attorney's Office for further review by a PRTAUSA. Documents or data identified by the PRTAUSA after review as not potentially privileged may be given to the Search Team.  If, after review, the PRTAUSA determines it to be appropriate, the PRTAUSA may apply to the court for a finding with respect to particular documents or data that no privilege, or an exception to the privilege, applies.  Documents or data that are the subject of such a finding may be given to the Search Team. Documents or data identified by the PRTAUSA after review as privileged will be maintained under seal by the investigating agency without further review absent subsequent authorization.

13.  The Search Team will search only the documents and data that the Privilege Review Team provides to the Search Team

at any step listed above in order to locate documents and data
that are within the scope of the search warrant.  The Search
Team does not have to wait until the entire privilege review is
concluded to begin its review for documents and data within the
scope of the search warrant.  The Privilege Review Team may also
conduct the search for documents and data within the scope of
the search warrant if that is more efficient.

14.  In performing the reviews, both the Privilege Review
Team and the Search Team may:

a.  search for and attempt to recover deleted,
"hidden," or encrypted data;

b.  use tools to exclude normal operating system
files and standard third-party software that do not need to be
searched; and

c.  use forensic examination and searching tools,
such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may
use hashing and other sophisticated techniques.

15.  If either the Privilege Review Team or the Search
Team, while searching a digital device, encounters immediately
apparent contraband or other evidence of a crime outside the
scope of the items to be seized, they shall immediately
discontinue the search of that device pending further order of
the Court and shall make and retain notes detailing how the
contraband or other evidence of a crime was encountered,
including how it was immediately apparent contraband or evidence
of a crime.

x

16.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

17.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

18.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain forensic copies of the digital device but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

19.  The government may also retain a digital device if the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

20.  After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

21.   In order to search for data capable of being read or interpreted by a digital device, the Search Team is authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

22.   During the execution of this search warrant, law enforcement is permitted to: (1) depress WIEDERHORN and THAYER's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which

xii

specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of WIEDERHORN and THAYER's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in *Graham v. Connor*, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

23. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## **EXHIBIT 1**

- Fat Brands Inc
- Fog Cutter Capital Group, Inc.
- Fog Cap Development, LLC
- Fatburger North America
- Buffalo's Franchise Concepts, Inc.
- Homestyle Dining, LLC
- Bonanza Restaurant Company, LLC
- Hurricane AMT, LLC
- Fatburger Restaurants of NJ, Inc.
- Fog Cutter Acquisition, LLC
- Fog Cutter Holdings, LLC
- FAT Brands Royalty I, LLC
- Yalla Mediterranean Franchising Company, LLC
- Ponderosa Franchising Company, LLC
- EB Franchises, LLC
- Johnny Rockets Holding Co.
- Fog Cap Acceptance Inc.
- BC Canyon LLC
- Fatburger Holdings, Inc.

**EXHIBIT 2**

- Andrew Wiederhorn
- Thayer Wiederhorn
- Taylor Wiederhorn
- Mason Wiederhorn
- Mercer Wiederhorn
- Taite Wiederhorn
- Madison Wiederhorn
- Peggy Wiederhorn
- Tiffany Wiederhorn
- Jessica Klepper
- Don Berchtold

**AFFIDAVIT**

**TABLE OF CONTENTS**

I. PURPOSE OF AFFIDAVIT ........................................ 1

II. BACKGROUND FOR SPECIAL AGENT NATHAN A. CHERNEY ............. 2

III. SUMMARY OF PROBABLE CAUSE ................................. 4

IV. STATEMENT OF PROBABLE CAUSE ............................... 7

  A. BACKGROUND INFORMATION ................................... 7

    1. History of Relevant Corporate Structures ............... 7

    2. Federal Tax Obligations ............................... 9

      a. Federal Payroll Tax Obligations ...................... 9

      b. Federal Income Tax Obligations for Individuals ....... 10

      c. Federal Income Tax Evasion ........................... 11

    3. Section 402 of the Sarbanes Oxley Act of 2002 ("SOX") .. 12

  B. TAX OFFENSES RELATING TO WIEDERHORN'S EVASION AND
OBSTRUCTION OF IRS COLLECTION EFFORTS ....................... 12

    1. WIEDERHORN's Prior Tax Crime .......................... 12

    2. IRS Collection Activities ............................. 13

    3. WIEDERHORN Made Materially False Statements to the IRS to
Evade Payment of Taxes in violation of 26 U.S.C. §§ 7201,
7206(1) and 7212(a) ...................................... 15

    4. WIEDERHORN Failed to Report Assets that He Hid Under
Nominee Individual and Business Names in Violation of 26
U.S.C. §§ 7201, 7212(a) .................................. 22

    5. WIEDERHORN Filed False Tax Returns in violation of 26
U.S.C. § 7206(1) ......................................... 23

    6. WIEDERHORN Used Credit Cards Paid by FAT to Fund His
Lifestyle and Failed to Report these Monies as Income in
Violation of 26 U.S.C. §§ 7201, 7206(1) .................. 27

  C. FRAUD OFFENSES RELATED TO FAT ............................ 27

    1. Overview of WIEDERHORN'S False and Fraudulent
Compensation-Related Disclosures ......................... 27

    2. WIEDERHORN's Undisclosed Income Was Funneled Through Sham
Loans Disguised as Legitimate Business Loans ............. 28

      a. WIEDERHORN Signs Loan Agreements between FAT and FOG
CUTTER ................................................... 28

    b. FAT Takes on Additional Debt Resulting in Further Diversion of Funds to WIEDERHORN ......................... 30

    c. FAT Absorbs FOG CUTTER's Debt and FOG CUTTER Forgives Loans to WIEDERHORN ...................................... 33

    d. WIEDERHORN Does Not Disclose the Existence of FAT's Indirect Loans to WIEDERHORN Via FOG CUTTER ............. 34

    e. WIEDERHORN Caused FAT to Lend FOG CUTTER Funds Which FOG CUTTER Had No Apparent Intention (and Limited Ability) to Repay ...................................................... 36

  3. WIEDERHORN Used Funds Derived from FAT to Pay for His Lavish Lifestyle ......................................... 37

    a. WIEDERHORN and THAYER's Use of PayPal and Abuse of Credit Cards Ultimately Paid for by FAT BRANDS to Generate Improper and Undisclosed Personal Wealth and Benefits ............. 37

    b. WIEDERHORN and His Family's Use of Credit Cards for Personal Expenses Paid by FAT ........................... 40

 D. CONNECTIONS TO SUBJECT PREMISES ......................... 43

  1. SUBJECT PREMISES 1 ................................... 43

  2. SUBJECT PREMISES 2 ................................... 43

 E. TRAINING AND EXPERIENCE IN INVESTIGATING FINANCIAL OFFENSES 44

 F. TRAINING AND EXPERIENCE ON DIGITAL DEVICES .............. 46

V. CONCLUSION ............................................... 50

I. ITEMS TO BE SEIZED ........................................ i

4. SEARCH PROCEDURES FOR HANDLING POTENTIALLY PRIVILEGED INFORMATION................................................. vi

## AFFIDAVIT

I, Nathan Cherney, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.   This affidavit is submitted in support of applications for warrants to search the following:

a.   The residence of ANDREW WIEDERHORN ("WIEDERHORN"), located at 929 Foothill Road, Beverly Hills, CA 90210 ("SUBJECT PREMISES 1") as described more fully in Attachment A-1;

b.   The residence of THAYER WIEDERHORN ("THAYER"), located at 342 North Croft Avenue, Los Angeles, CA, 90048 ("SUBJECT PREMISES 2")[1] as described more fully in Attachment A-2;

c.   The person of ANDREW WIEDERHORN as further described in Attachment A-3; and

d.   The person of THAYER WIEDERHORN as further described in Attachment A-4.

2.   The requested warrants seek authorization to search for and seize evidence, fruits, and instrumentalities of violations of 15 U.S.C. §§ 78j, 78ff, and 17 C.F.R. § 240.10b-5 (securities fraud); 18 U.S.C. §§ 1001 (false statements); 1343 (wire fraud); 1348 (securities fraud); 1349 (conspiracy to commit wire fraud and securities fraud); 1956 and 1957 (money laundering); 26 U.S.C. §§ 7201 (attempt to evade or defeat tax);

---

[1] SUBJECT PREMISES 1 and 2, when referred to collectively are hereafter referred to as the "SUBJECT PREMISES."

1

7206(1) (filing a false tax return); and 7212 (interference with administration of Internal Revenue laws) (collectively, the "SUBJECT OFFENSES").

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND FOR SPECIAL AGENT NATHAN A. CHERNEY**

4.    I am a Special Agent with the Federal Bureau of Investigation and have been so employed since January 2018. I am currently assigned to a Complex Financial Crime squad of the FBI's Los Angeles Field Office, which is responsible for investigating corporate and securities fraud, including mail fraud, wire fraud, securities fraud, and insider trading.

5.    Since becoming an FBI Special Agent in 2018, I have received approximately 19 weeks of formal training in financial analysis, interviewing, surveillance, and other investigative techniques at the FBI Training Academy in Quantico, Virginia. In June 2019, I also attended a multi-day Securities Industry Essentials training sponsored by the FBI Economics Crimes Unit.

6.    Before joining the FBI, I performed numerous financial audits while employed as an auditor at a public accounting firm

for approximately three years. I participated in many aspects of the audits including, but not limited to, procedures for fraud detection, financial analysis, and reviews of accounting and bank records.  I received approximately eight weeks of formal training from the accounting firm including, but not limited to, fraud, accounting principles, financial analysis, and auditing principles.

7.    I hold a Bachelor of Arts degree in Economics and a Master of Science in Accounting.  I am currently a Certified Public Accountant in the State of California.

8.    In addition to my formal training and personal experience, I have learned from and worked alongside numerous senior FBI agents with years of experience in various criminal investigations including, but not limited to, corporate and securities fraud, mail fraud, wire fraud, securities fraud, and insider trading.  Throughout my experiences with these senior agents, I have received guidance, training, and hands on experience in various investigative techniques including but not limited to, interviewing, surveillance, financial analysis, and other investigative techniques, including with respect to the identification and tracing of illicit proceeds.

9.    In investigating fraudulent schemes, I have become familiar with the types of records and documents that individuals and entities use to perpetrate their schemes, and have participated in the execution of search warrants at homes and businesses of individuals involved in fraudulent schemes.

3

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

10.  For the reasons that follow, I believe there is probable cause to believe that WIEDERHORN—who has previously been convicted of two federal felonies relating to false tax filings and illegal corporate gratuities—has devised and executed a fraudulent scheme to evade lawful federal tax obligations and generate improper and fraudulently disclosed and undisclosed compensation from corporate entities, including a publicly-traded company under his control.  In particular, there is probable cause to believe:

a.  From at least 2012 to present, the Internal Revenue Service ("IRS") has attempted to collect unpaid tax balances from WIEDERHORN relating to unpaid personal income and corporate payroll tax liabilities.[2] To evade income taxes owed and frustrate ongoing income-tax-collection efforts, WIEDERHORN significantly understated his income and assets to the IRS through various false statements and omissions of fact.  These false statements and omissions were inconsistent with and contradicted by statements and representations WIEDERHORN made to banks and other counterparties to acquire financing for the purchase of luxury homes and automobiles.

b.  WIEDERHORN also willfully subscribed to false tax returns for tax years 2017 and 2018 by understating his

---

[2] WIEDERHORN's collection file was opened and closed several times since 2012. The file was closed as WIEDERHORN entered into installment agreements with the IRS or the assigned IRS revenue officers accomplished their assigned duties. WIEDERHORN's file was then reopened on the multiple occasions when he defaulted on those installment agreements.

compensation. WIEDERHORN's 2017 and 2018 individual income tax returns stated that his total income was $395,508 and $403,311, respectively. These stated income amounts were inconsistent with statements WEIDERHORN made in connection with loan applications to purchase SUBJECT PREMISES 1 and a Chevrolet Suburban, in which he disclosed earnings of approximately 2,400,000 per year.

c.   In furtherance of his efforts to evade taxes owed, WIEDERHORN also fraudulently and materially misrepresented the compensation he received from FAT, a public company under his control.  According to FAT's U.S. Securities and Exchange Commission ("SEC") Form 10-K (annual report) filings, WIEDERHORN represented to investors that his total compensation from FAT ranged from a low of $254,768 to a high of $419,962 in fiscal years 2017 through 2020. In fact, WIEDERHORN caused FAT to loan millions of dollars to an entity under his control, FOG CUTTER CAPITAL GROUP, INC. ("FOG CUTTER"), and then used those funds for personal luxury purchases.

d.   As an additional aspect of WIEDERHORN's efforts to funnel undisclosed income to himself through corporate entities under his control, WIEDERHORN caused FOG CUTTER to make and then forgive millions of dollars in sham loans to him and then caused FAT to assume and forgive the FOG CUTTER liabilities from such undisclosed compensation to WIEDERHORN.  In this way, WIEDERHORN funneled funds to himself while avoiding scrutiny under the relevant provisions of the Sarbanes-Oxley Act, which prohibited direct and indirect loans to executives such as WIEDERHORN.  Only later, in March 2021, did FAT first disclose

that FOG CUTTER had been advancing millions of dollars to WIEDERHORN, and that such loans were ultimately forgiven in connection with FAT's merger with FOG CUTTER.

     e.  WIEDERHORN's son, THAYER, is the Chief Marketing Officer at FAT.  Financial records show that THAYER's PayPal account was used to generate millions of dollars in round-trip PayPal transactions through FAT.  These transactions had no apparent business purpose.  An apparent purpose of these round-trip transactions, which generated hundreds of thousands of dollars in transaction costs for FAT, was to generate credit-card rewards points for the WIEDERHORN credit card used in this scheme.

    11.  Accordingly, there is probable cause to believe that WIEDERHORN engaged in the following criminal conduct: (a) tax offenses relating to WIEDERHORN's efforts to evade, impede, and obstruct IRS collection actions; (b) fraud offenses relating to WIEDERHORN's material misrepresentations to investors regarding his true compensation from FAT; and (c) fraud and money laundering offenses relating to personal expenses that WIEDERHORN caused FAT or FAT affiliates to pay.

    12.  There is probable cause to believe that evidence of the SUBJECT OFFENSES will be found at the SUBJECT PREMISES for the following reasons:

     a.  SUBJECT PREMISES 1 is WIEDERHORN's personal residence, as evidenced by records reviewed during the course of this investigation as well as his recent observed presence walking with dogs on the street on which SUBJECT PREMISES 1

sits.  Based on my training and experience and evidence obtained during this investigation, I know that SUBJECT PREMISES 1 is likely to contain WIEDERHORN's personal and business records, digital devices that are likely to contain such records, and luxury items that are the fruits of WIEDERHORN's criminal activities.

b.  SUBJECT PREMISES 2 is THAYER's personal residence, as evidence by records reviewed in the course of this investigation and THAYER's observed presence leaving PREMISES 2 on or around November 17, 2021. Based on my training and experience and investigation to date, I believe SUBJECT PREMISES 2 is likely to contain evidence of the SUBJECT OFFENSES in the form of banking and business records, digital devices containing such records or communications relating to such records.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

### A.  BACKGROUND INFORMATION

#### 1.  <u>History of Relevant Corporate Structures</u>

13.  From my review of securities filings and other documents obtained and reviewed in the course of this investigation along with discussions with other special agents of the FBI and IRS, I know the following:

a.  WIEDERHORN was and is a member of the Board of Directors and Chief Executive Officer ("CEO") of FAT and has been at all relevant times.

b.  WIEDERHORN was also Chairman of the Board of Directors and CEO of FOG CUTTER at all relevant times.

c.   The connection between FOG CUTTER and the
business entities that would later be subsumed within FAT began
no later than around August 2003, when FOG CUTTER acquired a
controlling interest in FAT predecessor Fatburger Holdings, Inc.
("FH"), which had operated or franchised Fatburger branded
hamburger stands in the United States through a related entity,
Fatburger North America, Inc. ("FNA").

d.   In 2017, FOG CUTTER formed FAT as a wholly-owned
subsidiary for the purpose of creating a publicly-traded
company.  On or around October 20, 2017, FAT completed an IPO
and issued 2,000,000 additional shares of common stock (20% of
FAT's common stock) at an offering price of $12.00 per share,
for an aggregate offering amount of $24,000,000. According to
FAT's filings with the SEC, FOG CUTTER owned approximately 80%
of FAT's outstanding shares after the IPO, with the remaining
20% having been offered to the investing public.

e.   On December 10, 2020, FAT and FOG CUTTER entered
into an Agreement and Plan of Merger (the "Merger Agreement") in
which FOG CUTTER would, through a related LLC, effectively merge
and subsume itself into FAT. According to FAT's SEC filings, the
merger was done in part to preserve FOG CUTTER's approximately
$100 million net operating loss carry-forward for tax purposes,
while allowing additional equity raises not previously
permitted.

f.   As set forth in greater detail below, various
additional corporate affiliates of FOG CUTTER and FAT are
relevant to the Subject Offenses insofar as WIEDERHORN used such

affiliates and their bank accounts to funnel undisclosed and undeclared income to himself through those entities and accounts.  In particular:

      i.  FOG CAP DEVELOPMENT, LLC ("FOG CAP"), a wholly-owned subsidiary of FOG CUTTER.  As WIEDERHORN described it to an IRS Revenue Officer ("RO"), FOG CAP was a flow-through entity designed to handle the payroll for FOG CUTTER, FNA, and associated businesses;

      ii.  Buffalo's Franchise Concepts, Inc. ("BFC"), which FOG CAP purchased in or around November 2011 and which FAT absorbed in connection with the 2017 IPO;

      iii. Bonanza Restaurant Company ("Bonanza"), which FOG CUTTER purchased in 2017 through its acquisition of its parent, Homestyle Dining LLC ("Homestyle") and which FAT absorbed in connection with the 2017 IPO.

    2.  <u>Federal Tax Obligations</u>

      *a.  Federal Payroll Tax Obligations*

14.  From my training and experience and my discussions with IRS-Criminal Investigation ("IRS-CI") SAs, I know the following regarding federal payroll taxes:

    a.  The Internal Revenue Code imposes four types of tax with respect to wages paid to employees: (1) income tax; (2) Social Security tax; (3) Medicare tax; and (4) federal unemployment tax (collectively, "payroll taxes").

    b.  Income tax is imposed upon employees based upon the amount of wages they receive.

      c.   Social Security tax and Medicare tax are imposed by the Federal Insurance Contributions Act and are collectively referred to as "FICA" taxes.  FICA taxes are imposed separately on employees and on employers.

      d.   Employers are required to withhold employee FICA taxes and income taxes from the wages paid to their employees, and to pay over the withheld amounts to the United States. The employer's duty to pay over income taxes required to be collected exists even if the taxes are not actually withheld from the employees' wages.  The employee FICA taxes and income taxes that employers are required to withhold and pay over to the United States are commonly referred to as "trust fund taxes" because of the provision in the Internal Revenue Code requiring that such taxes "shall be held to be a special fund in trust for the United States."

      e.   The IRS can assess a penalty against any person who is responsible for collecting or paying withheld income and employment taxes, and willfully fails to collect or pay them. A responsible person is a person or group of people who has the duty to perform and the power to direct the collecting, accounting, and paying of trust fund taxes.

      *b.   Federal Income Tax Obligations for Individuals*

15.   Based on my training and experience, as well as discussions with IRS-CI SAs, I have learned the following regarding federal income tax obligations for individuals:

a.   Gross income is defined under 26 U.S.C. § 61(a) as all income from whatever source derived, including, but not limited to, the following items: (1) compensation for services, including fees, commissions, fringe benefits, and similar items; (2) gross income derived from business; (3) gains derived from dealings in property; and (4) dividends. Bonuses from employers are included in the definition of gross income.

b.   Individuals who fail to pay over taxes due may be subject to civil IRS collection efforts. The IRS has the power to levy and seize assets to satisfy delinquent tax balances.

*c.   Federal Income Tax Evasion*

16.   Based on my training and experience, as well as discussions with IRS-CI SAs, I know the following regarding federal income tax evasion:

a.   Federal income tax evasion occurs when an individual willfully attempts an affirmative act to evade the assessment of tax or defeat the payment of a tax due and owing to the IRS.

b.   Because the IRS often relies upon taxpayers' stated income in fashioning repayment plans and other efforts to collect taxes owed, tax-evaders often conceal income to frustrate the IRS's efforts.

c.   Concealing income and assets by titling assets under nominee individuals and corporate entities is one common method to impede and evade those IRS collection efforts.

d.   Generating compensation in forms that appear not to be income, such as in the form of reimbursements, false

11

loans, or hidden as undisclosed transfers of funds is another method commonly used to generate income while evading IRS's efforts to collect owed taxes.

      3.   <u>Section 402 of the Sarbanes Oxley Act of 2002 ("SOX")</u>

17.  In 2002, the United States Congress passed SOX, which, among other things, expanded requirements for boards and management of public companies as well as public accounting firms. Section 402 of SOX prohibits issuers from providing personal loans to directors or executives of public companies.

18.  Thus, Section 13(k)(1) of the Securities Exchange Act, 15 U.S.C. § 78m(k)(1), was amended to provide, "[i]t shall be unlawful for any issuer . . . directly or indirectly, including through any subsidiary, to extend or maintain credit, to arrange for the extension of credit, or to renew an extension of credit, in the form of a personal loan to or for any director or executive officer (or equivalent thereof) of that issuer."

   **B.**   **TAX OFFENSES RELATING TO WIEDERHORN'S EVASION AND OBSTRUCTION OF IRS COLLECTION EFFORTS**

      1.   WIEDERHORN's Prior Tax Crime

19.  From my training and experience, my review of documents related to this investigation, and my discussion with IRS-CI SA's, I know the following:

    a.  On June 3, 2004, WIEDERHORN pleaded guilty to giving an illegal gratuity and subscribing to a false tax return, in violation of 18 U.S.C. § 1954 and 26 U.S.C.

§ 7206(1), respectively, in the United States District Court for the District of Oregon.[3] WIEDERHORN was sentenced to eighteen months imprisonment and required to pay a $25,000 fine and $2 million in restitution.

   b.   According to documents filed in a private litigation, FOG CUTTER's board of directors awarded WIEDERHORN a $2 million bonus the day before WIEDERHORN's 2004 federal felony guilty plea and agreed to continue compensating him for an additional 18 months.

   c.   Consequently, on or around October 12, 2004, FOG CUTTER announced it was being delisted from the NASDAQ due to its continued affiliation with and compensation to WIEDERHORN after his June 2004 pleas of guilty.

   2.   IRS Collection Activities

20.   From my training and experience, my review of documents related to this investigation, and my discussion with IRS-CI SA's, I know the following:

   a.   From at least 2012 to the present, WIEDERHORN has been the subject of ongoing IRS collection activities related to nonpayment of personal income and trust fund taxes owed by WIEDERHORN and entities related to FOG CUTTER.

   b.   In August 2012, an IRS RO interviewed WIEDERHORN regarding unpaid trust fund taxes for a FAT predecessor entity. The IRS then assessed a $570,501 penalty against WIEDERHORN on

---

[3] United States v. Wiederhorn, 3:04-cr-00238-BR (D. Or. 2004).

or around February 2013 for failure to pay over trust fund taxes due from all four quarters of 2011.

c.   WIEDERHORN was also interviewed by an IRS RO regarding unpaid trust fund taxes for FOG CAP in October 2015. According to the IRS RO assigned at that time, ("RO 1"), WIEDERHORN admitted full responsibility for those corporate tax debts.   WIEDERHORN also stated that his staff only writes checks on his direct orders. At the time of the interview, the IRS RO provided IRS Publication 784 to WIEDERHORN, which outlined WIEDERHORN's personal liabilities for failure to pay trust fund taxes. RO 1 further underscored to WIEDERHORN that repayment was not optional and that the IRS could levy his bank accounts and other properties and assets should WIEDERHORN fail to meet his repayment obligations.

d.   In April 2016, the IRS assessed WIEDERHORN a penalty of $2,167,187 for FOG CAP's failure to pay over trust fund taxes from 2013 to 2015.

e.   In September 2016, the IRS assessed WIEDERHORN an additional penalty of $239,141 for failure to pay over trust fund taxes owed by FOG CAP from the first quarter of 2016.

f.   In April 2018, WIEDERHORN signed an IRS Form 2751, Proposed Assessment of Trust Fund Penalty (Form 2751) by which he took full personal responsibility for the new, unpaid trust fund taxes owed to the IRS.

g.   In May 2018, WIEDERHORN was assessed an additional penalty of approximately $687,395 for FOG CAP's

failure to pay over trust fund taxes from second quarter of 2016 through the third quarter of 2017.

        h.   As of March 24, 2021, WIEDERHORN's unpaid personal income tax liability to the IRS had totaled approximately $7,743,952, inclusive of statutory interest and penalties, and his unpaid principal balance totaled approximately $3,664,224.  Due to payments WIEDERHORN made since March 2021, WIEDERHORN's unpaid personal income tax liability as of or around November 10, 2021 was approximately $2,986,610 inclusive of accrued penalties and interest.

        i.   Throughout the period of civil collections activities, WIEDERHORN entered into several installment payment agreements with the IRS, for amounts ranging from $2,500 to $10,000 per month, based on statements and documents provided by WIEDHERORN to the IRS. According to IRS records, WIEDERHORN has previously defaulted on his installment agreements several times and has failed to comply with his IRS filing and payment requirements.  WIEDERHORN is currently in compliance with his latest installment plan, however.

        3.   WIEDERHORN Made Materially False Statements to
             the IRS to Evade Payment of Taxes in violation of
             26 U.S.C. §§ 7201, 7206(1) and 7212(a)

    21.  From my training and experience, my review of documents related to this investigation, and my discussion with IRS-CI SA's, I know the following:

        a.   During a June 12, 2018 meeting between WIEDERHORN; his authorized representative, Gary Slavett, Esq.; and an IRS RO assigned at that time ("RO 2"), WIEDERHORN

15

submitted a Collection Information Statement for Wage Earners and Self-Employed Individuals, Form 433-A[4] ("Form 433-A) containing several material misstatements and omissions:

      i.  Under the "Personal Vehicles Leased and Purchased" section of the Form 433-A WIEDERHORN listed only a 1994 Mercedes-Benz worth $10,000, a 2006 Mercedes-Benz worth $20,000 with a $20,000 loan balance, and a 2007 Chevrolet Suburban worth $7,000.

      ii.  Although the Form 433-A required WIEDERHORN to list "all real property owned or being purchased," WIEDERHORN's Form 433-A reported only his property at 585 F. Street, Gearhart, Oregon 97138 (the "Gearhart Property" or "F Street Property").[5] WIEDERHORN disclosed that the Gearhart Property was in foreclosure, with a loan balance of $3,000,000 against a fair market value of only $2,000,000.  WIEDERHORN omitted that he was in the process of purchasing other properties including SUBJECT PREMISES 1 and a property located at 1888 North Crescent Heights Boulevard, Los Angeles, California 90069 (the "Crescent Heights Property").

---

[4] Form 433-As are submitted to the IRS under penalty of perjury and requires taxpayers in collection with the IRS to list assets, liabilities, income, and expenses.  IRS ROs rely upon the Form 433-A to determine whether a taxpayer has assets or income that could be used to satisfy liabilities to the IRS.
[5] According to records obtained from the Clatsop County (Oregon) Clerk's Office, WIEDERHORN and WIEDERHORN's ex-wife are the owners of the adjacent property located at 671 Wellington Street, Gearhart, Oregon 97138. In a May 13, 2020 court filing in the divorce proceedings, Los Angeles Superior Court case number BD600290, WIEDERHORN's ex-wife claimed WIEDERHORN still retained title to the Wellington Property.

iii. WIEDERHORN did not disclose his American Express ("AMEX") personal credit card.

iv. WIEDERHORN reported only $10,000 of miscellaneous personal property on the Form 433-A.

v. For income, WIEDERHORN reported only his wages earned and no additional income. He also claimed he only paid approximately $3,133 per month in housing expenses.

vi. WIEDERHORN also claimed to RO 2 that he was unable to generate income or earnings from FAT sufficient to satisfy his delinquent tax balances.

b. I believe WIEDERHORN's statements and omissions on his Form 433-A and his June 12, 2018 interview were materially and knowingly false because:

i. First, WIEDERHORN was untruthful and misleading when he claimed he was unable to generate additional income from FAT:

(I) From 2017 to the present WIEDERHORN transferred or caused to be transferred millions of dollars from FAT or FAT's affiliates (sometimes via FOG CUTTER and FOG CAP) to his personal bank account, which WIEDERHORN used to fund his luxurious lifestyle. For example, from April 26, 2018 to June 25, 2018, WIEDERHORN's personal Mechanics Bank account ending in 3481 (the "3481 Personal Mechanics Account") received $354,975.00 in wire transfers from BFC and FAT ($73,575 and $281,400, respectively). On June 19, 2018, the 3481 Personal Mechanics Account received $15,000 from FOG CUTTER's Mechanics Bank account ending in 3472; the money used to fund that

transfer originated from FAT's Mechanics Bank account ending in 1080 (the "1080 FAT Mechanics Account").

(II) And as set forth herein, WIEDERHORN used an American Express ("AMEX") Personal Centurion card, account ending in 5-15007 ("WIEDERHORN Centurion Card"), primarily paid from the corporate account of a FAT affiliate, FNA, to fund his luxurious lifestyle.

ii.  Second, WIEDERHORN misrepresented the true contractual arrangement for SUBJECT PREMISES 1. The lease for SUBJECT PREMISES 1 was between the Heyward Trust[6] and FNA, not WIEDERHORN in his individual capacity.  Additionally, WIEDERHORN held an option to purchase SUBJECT PREMISES 1 (which he ultimately exercised) but did not disclose this to the RO.   In fact:

(I)  WIEDERHORN signed a lease for SUBJECT PREMISES 1 in the name of FNA on or around March 14, 2011.  The lease indicates SUBJECT PREMISES 1 was "for the sole use as a personal residence by the following named person(s) only: Andy, Tiffany and 3 children."[7]  The initial lease agreement had a monthly rent of approximately $25,000 and provided the Tenant

---

[6] Andy Heyward and Amy Heyward (collectively the "Heywards"), as Trustees of the Andy and Amy Heyward Living Trust dated February 26, 2008 ("Heyward Trust"), were the lessors.
[7] I believe "Andy" to be WIEDERHORN, and "Tiffany" to be WIEDERHORN's ex-wife, Tiffany Wiederhorn ("Tiffany").

18

with the right to purchase SUBJECT PREMISES 1 for $9,000,000 during the term of the lease.[8]

(II) Based on my review of a purchase agreement dated on or around August 24, 2018, an LLC owned and controlled by WIEDERHORN, 929 Foothill, LLC, offered to purchase SUBJECT PREMISES 1 from the Heywards for approximately $9,094,137. According to an operating agreement for 929 Foothill LLC in the Government's possession, WIEDERHORN is the 100% owner of the membership interests of 929 Foothill, LLC.

(III)    WIEDERHORN applied for a $9,500,000 loan to purchase SUBJECT PREMISES 1.  On or around June 12, 2018, the very day WIEDERHORN met with RO 2, WIEDERHORN emailed a Microsoft Excel personal financial statement dated May 31, 2018 from his email account andy.wiederhorn@fccgi.com to a mortgage broker at the Cohen Financial Group.

(IV) WIEDERHORN's characterizations and omissions regarding SUBJECT PREMISES 1 to RO2 were inconsistent with the May 31, 2018 financial statement. On the financial statement, WIEDERHORN reported SUBJECT PREMISES 1 as an $8 million net asset (an $18 million leasehold interest less a $10 million leasehold mortgage).

iii. Third, WIEDERHORN also lied about the status of his vacation home, the F Street Property. According to records obtained from the F Street lender, Nationstar Mortgage,

---

[8] Documents obtained by the Government show the lease and option to purchase SUBJECT PREMISES 2 were amended subsequent to the initial agreement.

LLC (doing business as Mr. Cooper ("Mr. Cooper"), and one of Mr. Cooper's employees, the home was not in foreclosure on June 12, 2018. Rather, WIEDERHORN had previously requested a modification, which had been approved almost three months prior, on or around March 15, 2018, and had already brought the loan current as of May 2018. Indeed, WIEDERHORN had claimed to possess approximately $5,750,000 in net equity in the F Street Home on his Uniform Residential Loan Application (Fannie Mae Form 1003) ("URLA") for SUBJECT PREMISES 1 as well as for the Crescent Heights Property, as discussed further below.

c.   Fourth, although WIEDERHORN had claimed to RO2 that he had no personal assets, WIEDERHORN had inconsistently reported owning $72,000,000 in FOG CUTTER stock, $1,000,000 net cash value in life insurance, $150,000 in vested retirement funds, and $1,075,000 in personal property on the SUBJECT PREMISES 1 URLA, which WIEDERHORN signed under penalty of perjury on or around August 29, 2018.

i.   Also inconsistent with WIEDERHORN's assertion that he had no personal assets was his June 9, 2018, purchase of a luxury vehicle just three days prior to his meeting with RO 2.

d.   In a subsequent discussion with the IRS held on or about February 21, 2020 to review WIEDERHORN's ability to pay amounts owed to the IRS, WIEDERHORN's authorized representative, Kathryn Parry, represented that FOG CAP was a defunct corporation with no assets. However, records from Mechanics Bank show that FOG CAP maintained an account there, which was

used to funnel money from FAT to WIEDERHORN's personal account as follows:

      i.  On or about March 18 and March 19, 2020, approximately $7,794 and $2,920, respectively, were transferred from the 1080 FAT Mechanics Account to the FOG CAP account ending in 3469 (the "3469 FOG CAP Mechanics Account").  Almost all of those funds were transferred to WIEDERHORN's personal Mechanics Bank account ending in 6520 (the "6520 Personal Mechanics Account") on the same days and were used to pay WIEDERHORN's Capital One, JP Morgan Chase, and Discover credit cards, and his 2018 Chevrolet Suburban.

      ii.  In July 2020, all deposits to the 3469 FOG CAP Mechanics Account came from the 1080 FAT Mechanics Account. During this time, there were a total of ten transfers from the 3469 FOG CAP Mechanics Account, totaling approximately $70,746, to the 6520 Personal Mechanics Account. The 3469 FOG CAP Mechanics Account began with a $0.00 balance as of July 1, 2020, meaning all the funds transferred to the 3469 Personal Mechanics Account originated from FAT.  The funds WIEDERHORN transferred to the 6520 Personal Mechanics Account were used for credit-card, vehicle, mortgage, and utility payments.

      e.  For the foregoing reasons, I believe WIEDERHORN's false statements to the RO on June 12, 2018 concealed his true ability to pay his delinquent taxes and impeded and interfered with the IRS's collection activities.

        4.   WIEDERHORN Failed to Report Assets that He Hid Under Nominee Individual and Business Names in Violation of 26 U.S.C. §§ 7201, 7212(a)

22. From my training and experience, my review of documents related to this investigation, and my discussion with IRS-CI SA's, I know the following:

     a.  WIEDERHORN's ex-wife, Tiffany, filed for divorce in or around January 2014.[9] The dissolution of marriage was finalized in or around October 2018. As part of the divorce settlement, WIEDERHORN was required to pay $40,000 per month to Tiffany and purchase a residence for her.

     b.  Based on my review of a purchase agreement dated on or around June 11, 2018, WIEDERHORN and Tiffany entered into a purchase agreement to purchase the Crescent Heights Property for approximately $2,450,000. Escrow closed on the purchase on or about August 13, 2018.

     c.  Based on an August 1, 2018 escrow amendment, I believe WIEDERHORN concealed this asset from the potential view of the IRS by substituting 1888 Crescent, LLC as the buyer. I believe WIEDERHORN to be the 100% owner of the membership interests of 1888 Crescent, LLC because the Operating Agreement for 1888 Crescent, LLC lists WIEDERHORN as the 100% owner of its membership interests.

     d.  Similarly, and as noted above, WIEDERHORN also closed on the purchase of SUBJECT PREMISES 1 on or about September 20, 2018, and employed another LLC—this time 929

---

[9] Los Angeles Superior Court, Case number BD600290.

Foothill, LLC——to conceal WIEDERHORN's ownership interest from the IRS.

        e.   WIEDERHORN appears to have used a similar process in connection with an approximately $100,000 Steinway & Sons Model M Spirio grand player piano, which WIEDERHORN appears to have purchased in Jessica Klepper's ("Klepper")[10] name in May 2019. UCC filings (upon which the IRS relies to trace luxury purchases), list Klepper as the purchaser, but Mechanics Bank accounts ending in 3481 and 4210, on which WIEDERHORN is the sole signer, show monthly payments of approximately $1,091 drawn for purposes of payments upon that piano from June through October 2019.[11]

        5.    WIEDERHORN Filed False Tax Returns in violation of 26 U.S.C. § 7206(1)

23.  From my training and experience, my review of documents related to this investigation, and my discussion with IRS-CI SAs, I believe WIEDERHORN also willfully subscribed to false tax returns for tax years 2017 and 2018 in violation of 26 U.S.C. § 7206(1) for the following reasons:

        a.   WIEDERHORN reported on his 2017 Form 1040 that his total income for tax year 2017 was $395,508. WIEDERHORN reported his 2018 income on his 2018 Form 1040 as $403,311. Both

---

[10] As of July 28, 2021, Klepper's Instagram profile ("IKLEP") indicates she is the "wife to @andrewwiederhorn."

[11] Beginning in January 2020, some of the piano payments were made from WIEDERHORN and Klepper's personal joint checking Mechanics Bank account ending in 8130 ("8130 Personal Joint Mechanics Account"). However, other funds for the payments trace back to FOG CUTTER and its subsidiary entities.

returns were signed under penalty of perjury and filed with the IRS. In fact, as WIEDERHORN knew, his true income in both years was substantially higher:

b.   As noted above, according to the August 29, 2018 URLA WIEDERHORN executed in connection with his application to purchase SUBJECT PREMISES 1, WIEDERHORN's stated under penalty of perjury that his income was approximately $2,400,000 per year, which income included approximately $400,000 in wages and $2,000,000 in bonuses.

c.   And as part of a July 2, 2018 loan application for a Chevrolet Suburban, WIEDERHORN stated he earned $200,000 per month, which is consistent with his representation in the August 2018 URLA that he earned approximately $2,400,000 per year.

d.   Moreover, income less than $500,000 is inconsistent with the luxury lifestyle banking records show WIEDERHORN to have led, and the investigation to date has not identified any separate, non-corporate source of income or cash hoard that WIEDERHORN could otherwise have been using to support his expenses.

e.   Although many of the payments for WIEDERHORN's luxurious lifestyle expenses were made from WIEDERHORN's personal bank account, the monies funding those payments were ultimately derived from transfers from FOG CUTTER and FAT bank accounts as undeclared forms of compensation to WIEDERHORN.

f.   Based on my discussion with IRS-CI SAs, I believe that the willful failure to report more than one million dollars

in income makes the income tax returns WIEDERHORN subscribed to and filed materially false in violation of 26 U.S.C. § 7206(1).[12]

---

[12] In a September 28, 2020 communication, WEIDERHORN referred a lender or putative lender to his "2017 tax return," noting that he received:

> $3m-4m of distributions from my company as loans, then periodically the company forgives those loans. In 2017 $22m was forgiven (about 5+ years of loans to me). A similar amount was forgiven again in March of 2020 ($19m) representing loans for 2018-2020. If you remember we discussed a no-doc rate because of this, but I'll do whatever you need to get through underwriting.

In a subsequent related communication on this subject, WIEDERHORN's tax preparer opined, regarding "the basis of the tax positions taken with respect to tax years 2017 and for 2020" as follows:

> To confirm your characterization of the arrangement indicated below, over the years the FogCutter Capital Group Inc. ("FCCG" or "the Company") has periodically advanced you funds pursuant to an open accounts receivable arrangement. As part of the arrangement, memorialized or documented by a loan with interest agreement. In 2017, the Company (the lender) and you as borrower agreed to write off the receivable. As the borrower, the cancellation of the receivable (loan to you) created cancellation of indebtedness income in tax year 2017. At the point in time, your financial the cancellation of indebtedness income amount was able to excluded from your taxable income to the extent that you were insolvent [IRC section 108(a)(3)]

> This exception under IRC section 108(a)(l)(B) applies when the taxpayer is insolvent (outside of bankruptcy). Insolvency for this purpose is defined for this as the excess of liabilities over the fair market value ("FMV") of assets, as determined immediately before the debt discharge and including

the debt to be discharged (Miller, T.C. Memo. 2006-125). As noted above, the amount excluded from income by reason of a debtor's insolvency cannot exceed the amount of the debtor's insolvency. The taxpayer has the burden of proof in meeting the definition of insolvency (see Hill, T.C. Memo. 2009-101). In the calculation of a taxpayer's insolvency, non recourse debt is treated as a liability to the extent of the FMV of the property securing the debt, but can be taken into account under certain circumstances.

With respect to 2020, a similar analysis will be undertaken to determine first, whether notwithstanding the write off of the amount owed by you by (FCCG) in March, 2020, there is cancellation of indebtedness; and second, if so, the amount (of cancellation of indebted) involved. That is, just because the Company writes off the debt for financial accounting purposes, does not mean it is per se cancellation of indebtedness. Assuming that the Company has notified you of the cancellation, it would seem that given the Covid-19 circumstances and the implications to the then value (March 2020) value of the Fat Brands shares held by FCCG, the insolvency exception may apply to exclude some or all of cancelled debt from income. In the alternative, we may treat the debt cancelled as a 'dividend' to you. Given that during 2020 the Company has no accumulated or current earnings and profits, the amount of the cancellation may constitute in whole or in part, a non-taxable return of your capital.

Please contact me with questions that you or your banker may have.

From my training and experience and discussions with colleagues involved in this investigation, I do not believe this opinion to be correct, nor do I believe that WIEDERHORN could reasonably have believed that he could avoid taxation on what otherwise would be deemed as income by causing corporate entities under his control to extend him loans which he had no intention to repay and by maintaining an artificial form of insolvency by spending down all such loans on luxury purchases, failing to repay them, and then causing additional loans to be

> 6.   WIEDERHORN Used Credit Cards Paid by FAT to Fund
>      His Lifestyle and Failed to Report these Monies
>      as Income in Violation of 26 U.S.C. §§ 7201,
>      7206(1)

24.   From my training and experience, my review of documents related to this investigation, and my discussion with IRS-CI SAs, I know the following:

a.   In addition to the payments for luxury expenses from WIEDERHORN's bank accounts, and as discussed in further detail below, WIEDERHORN also engaged in a long-term pattern of purchasing luxury services and goods with credit cards that were paid primarily by a FAT affiliate using corporate funds.

b.   Although corporate payment of his personal expenses was income to WIEDERHORN, WIEDERHORN did not report this income on his personal tax returns.  WIEDERHORN thereby subscribed to tax returns that materially underreported his income, in violation of 26 U.S.C. § 7206(1), and furthered his attempt to defeat the payment of taxes due and owing in violation of 26 U.S.C. § 7201.

**C.   FRAUD OFFENSES RELATED TO FAT**

1.   Overview of WIEDERHORN'S False and Fraudulent Compensation-Related Disclosures

25.   From my training and experience, my review of documents related to this investigation, and my discussion with IRS-CI SAs and other law-enforcement officers, I believe WIEDERHORN engaged in a scheme to defraud by making and causing

---

extended after previously causing prior loans to be canceled due to purported insolvency.

to be made materially false and misleading statements in securities filings as described more fully below:

a.   According to FAT's 2017, 2018, and 2019 SEC Form 10-Ks, WIEDERHORN's compensation for 2016 through 2019 was as follows:

| Year | Salary | Option Awards | All Other Compensation | Total |
|------|--------|---------------|------------------------|-------|
| 2016 | $199,165 | $0 | $0 | $199,165 |
| 2017 | $251,147 | $3,621 | $0 | $254,768 |
| 2018 | $400,000 | $19,962 | $0 | $419,962 |
| 2019 | $400,000 | $13,863 | $0 | $413,863 |

b.   These disclosed compensation figures are inconsistent with the August 29, 2018 URLA WIEDERHORN signed under penalty of perjury, on which WIEDERHORN stated that he had an annual income of approximately $2,400,000.  The figures are also inconsistent with the hundreds of thousands of dollars of undisclosed and undeclared compensation which records obtained in the course of this investigation show flowed from FAT, FNA, FOG CUTTER, and affiliates to WIEDERHORN, as set out in further detail below.

2.   WIEDERHORN's Undisclosed Income Was Funneled Through Sham Loans Disguised as Legitimate Business Loans

a.   WIEDERHORN Signs Loan Agreements between FAT and FOG CUTTER

a.   An Intercompany Promissory Note between FOG CUTTER and FAT, dated October 20, 2017 (the "Original Note") was

disclosed in the 2017 Form 10-K filed with the SEC on or around April 2, 2018.

b.   By this note, which WIEDERHORN signed, FOG CUTTER promised to pay FAT $11,906,000 in principal in five years with 10% interest compounded annually.  The note was issued to document an intercompany payable owed by FOG CUTTER to FAT as of October 20, 2017.

c.   The declared purpose of the loan was as follows: "Maker [FOG CUTTER] certifies that the loan evidenced by this Note is obtained for business or commercial and not household purposes, and that the proceeds thereof shall not be used for the purchase of margin stock."

d.   According to an April 24, 2020 "Intercompany Revolving Credit Agreement" (the "IRCA") between FOG CUTTER and FAT, FAT had made additional intercompany advances to FOG CUTTER in the aggregate amount of $10,523,000 (the "Prior Revolving Loans") as of December 29, 2019.  The IRCA provided that "the Original Note, the Prior Revolving Loans, other adjustments, and the aggregate balance of accrued and unpaid interest . . . shall be converted into an initial balance of borrowings under this Agreement in the aggregate amount of $21,067,000, and additional borrowings that were made during the first fiscal quarter of 2020 . . . shall be added to the initial balance of borrowings under this Agreement." The terms of interest under the IRCA remained the same as under the Original Note (10%). WIEDERHORN executed this document as CEO on behalf of FAT (the Lender) and

by Ron Roe[13] as Chief Financial Officer ("CFO") of FOG CUTTER (the Borrower).

        *b.*    FAT Takes on Additional Debt Resulting in Further Diversion of Funds to WIEDERHORN

    e.  As disclosed in an SEC Form 8-K filed on May 3, 2018, FAT obtained $2,000,000 through a credit facility with TCA Global Credit Master Fund, LP ("TCA"), which had a maturity date of October 27, 2019, and bore a fifteen-percent annual interest rate. According to the Form 8-K, FAT "used the net proceeds for working capital purposes and repayment of other indebtedness."

    f.  According to an SEC Form 8-K FAT filed on July 10, 2018, FAT also entered into a Loan and Security Agreement with FB Lending LLC (the "FB Lending LSA") for an additional $16 million, again at an annual interest rate of fifteen percent, and used a portion of the loan proceeds (1) to fund an $8 million cash payment (and associated closing costs) to the members of Hurricane (one of the food franchisors purchased FAT); and (2) to repay the $2 million plus interest and fees it owed to TCA. The Form 8-K also states FAT intended to use the remaining proceeds (approximately $6 million) from the FB Lending LSA for "acquisitions and general working capital purposes." WIEDERHORN signed as the CEO on behalf of FAT (the borrower) under the FB Lending LSA.

---

[13] Roe was the CFO of FAT on the date of FAT's IPO. On August 16, 2018, FAT announced Rebecca Hershinger would serve as CFO, replacing ROE, with ROE to continue as the Senior Vice President of Finance. Effective May 13, 2021, FAT removed Hershinger as CFO and appointed Kenneth J. Kuick in her place.

g.  On July 3, 2018, FB Lending LLC wired approximately $13,630,951 into the 1080 FAT Mechanics Account. Between July 3, 2018 and October 5, 2018, approximately $5,207,351 was transferred from the 1080 FAT Mechanics Account to the 3472 FOG Mechanics Account, 3478 FNA Mechanics Account, and 3469 FOG CAP Mechanics Account.  The combined beginning balance in these three accounts the day before the FB Lending LLC deposit (July 2, 2018) was approximately $1, meaning most of the funds in these three accounts after July 2, 2018, were derived from the 1080 FAT Mechanics Account. During this time and from the three accounts, at least approximately $944,185 was used to pay the balances owed on the WIEDERHORN Centurion Card; at least approximately $105,000 was used to pay rent at SUBJECT PREMISES 1; and at least approximately $762,455 was transferred directly to the 3481 Personal Mechanics Account.

i.  Based on the personal nature of these expenses, I do not believe the use of these funds constitutes "acquisitions and general working capital purposes" as represented to investors via SEC filings regarding the FB Lending LSA.

ii. Moreover, FAT's filings with the SEC did not disclose to investors the use of any of these funds as additional compensation to WIEDERHORN.

h.  On the basis of my training and experience, I believe that it would be material to the investing public to know that FAT incurred more than $1 million in corporate debt

31

and used it, contrary to prior disclosures, to compensate its
CEO.

       i.   As disclosed in FAT's SEC Form 8-K filed, and
signed by WIEDERHORN as CEO, on or around February 4, 2019, FAT
refinanced the FB Lending LSA by entering into a new Loan and
Security Agreement (the "Lion Fund LSA") with The Lion Fund,
L.P. and The Lion Fund II, L.P (collectively the "Lion Funds").
In this refinancing, FAT took on $20 million of debt at twenty-
percent annual interest, and used the proceeds to repay the
existing $16 million FB Lending loan plus accrued interest and
fees and provide additional general working capital to FAT.

       j.   On January 30, 2019, the Lion Funds wired
approximately $1,670,376 to the 1080 FAT Mechanics Account. The
balance in the 1080 Mechanics Account the day before was
approximately $32,348, meaning that, as of January 30, 2019,
most of the funds in the account were from the Lion Funds. That
same day, upon receipt of the Lion Funds wire, approximately
$623,364 was transferred to the 3478 FNA Mechanics Account. The
balance in the 3478 FNA Mechanics Account the day before the
transfer (January 29, 2019) was approximately $0, meaning most
of the funds in the account were derived ultimately from the
Lion Funds' Loan to FAT.  Again on that same day, account
records reflect an approximately $604,011 payment from the 3478
FNA Mechanics Account to satisfy the Centurion Card debt.

       k.   In other words, the flow of funds makes clear
that cash from a corporate loan to FAT was used to pay more than
$600,000 in expenses WIEDERHORN had incurred on his credit card—

—many of them clearly personal in nature——rather than as "working capital" to fund FAT, as investors had been told was the purpose of incurring such debt.  On the basis of my training and experience, I believe this information would have been material to investors.

        *c.*    FAT Absorbs FOG CUTTER's Debt and FOG CUTTER Forgives Loans to WIEDERHORN

l.   On December 10, 2020, FAT and FOG CUTTER entered into an Agreement and Plan of Merger (the "Merger Agreement") in which FOG CUTTER would merge with Fog Cutter Acquisition, LLC, a wholly owned subsidiary of FAT.[14] On or around December 30, 2020, FAT filed a SEC Form 8-K, announcing the completion of the merger with FOG CUTTER. On or around March 12, 2021, FAT amended that filing to include financial statements for The Fog Cutter Group (a carveout of FOG CUTTER), detailing the financial impact of the merger.

m.   According to the audited financial statements and the accompanying notes, FOG CUTTER made advances to WIEDERHORN (the "Shareholder Loan") which led to outstanding balances of $16,803,000 and $9,155,000 as of December 29, 2019 and December 30, 2018, respectively. FOG CUTTER's consolidated U.S. Corporate Income Tax Returns, Form 1120, for tax years 2017–2020 do not reflect the Shareholder Loan.

---

[14] According to FAT's SEC filings, the merger was done in part to preserve FOG CUTTER's approximately $100 million net operating loss carry-forward for tax purposes, while allowing additional equity raises not previously permitted.

n.   During the thirty-nine weeks ending September 27, 2020, FOG CUTTER forgave $16,948,000 in debt that WIEDERHORN owed pursuant to that Shareholder Loan. The unaudited financial statements list the balance of the outstanding Shareholder Loan at $5,606,000 as of September 27, 2020.

o.   From my discussions with IRS-CI SAs, I believe that FOG CUTTER's forgiveness of sham loans to WIEDERHORN renders such amounts taxable as income——either as income in the year a sham loan was extended or, anyway, income in a year in which a loan was forgiven, in light of WIEDERHORN's inability to establish true insolvency.  Moreover, a scheme to incur debts knowing such debts will be forgiven is consistent with an attempt to evade taxation.

> d.   *WIEDERHORN Does Not Disclose the Existence of FAT's Indirect Loans to WIEDERHORN Via FOG CUTTER*[15]

p.   The Selling Agency Agreement between FAT and Tripoint Global Equities, LLC (Tripoint"), the lead selling agent to offer FAT shares to prospective investors as part of FAT's IPO, contains the following representation:

> There are no outstanding loans, advances, (except normal advances for business expenses in the ordinary course of business) or guarantees of indebtedness by

---

[15] As noted above, Section 402 of SOX prohibits both direct and indirect loans to executives.  For the reasons set forth throughout this affidavit, I believe WIEDERHORN's pattern of borrowing funds from FOG CUTTER and then causing FAT to make loans to FOG CUTTER to repay the funds WIEDERHORN had borrowed evidences an intent to conceal or obscure his violations of SOX.

the Company [FAT] to or for the benefit of any of the officers or directors of the Company [FAT] or any of their respective family members.  The Company [FAT] has not directly or indirectly, including through its Subsidiaries, extended or maintained credit, arranged for the extension of credit, or renewed any extension of credit, in the form of a personal loan to or for any director or executive officer of the Company [FAT] or any of their respective related interests, other than any extensions of credit that ceased to be outstanding prior to the initial filing of the Offering Statement.  No transaction has occurred between or among the Company and any of its officers or directors, stockholders, customers, suppliers, or any affiliate or affiliates of the foregoing that is required to be described or filed as an exhibit to the Offering Statement, the Preliminary Offering Circular, the Pricing Disclosure Materials or the Final Offering Circular and is not so described.

q.   On or around October 3, 2019, FAT closed a new offering of Series B Cumulative Preferred Stock and warrants and entered into a selling agency agreement with Tripoint and Digital Offering, LLC to act as FAT's selling agents for the offering. The selling agency agreement, signed by WIEDERHORN as CEO, made a similar representation that FAT had not made any extensions of credit in the form of a personal loan directly or indirectly to any directors or executive officers of FAT, which

35

appears to be materially false in light of the undisclosed transfers of funds from FAT to WIEDERHORN, both directly and indirectly via FOG CUTTER.

> e.  *WIEDERHORN Caused FAT to Lend FOG CUTTER Funds Which FOG CUTTER Had No Apparent Intention (and Limited Ability) to Repay*

26.   From my review of financial records, and for the following additional reasons, I believe that WIEDERHORN caused FAT to advance FOG CUTTER millions of dollars via the Original Note and the IRCA, which he mischaracterized as bona fide loans knowing they would never be repaid:

a.   While FAT was extending additional credit to FOG CUTTER, FOG CUTTER had minimal current assets, significant current liabilities, and little to no revenue. The following charts from FAT's SEC filings represent a snapshot of FOG CUTTER's financial condition as disclosed in the Fog Cutter Group's Audited Combined Financial Statements for December 30, 2018 and December 29, 2019:

| Year | December 30, 2018 | December 29, 2019 |
|---|---|---|
| **Revenues** | $828,000 | $0 |

| Year | December 30, 2018 | December 29, 2019 |
|---|---|---|
| **Total Current Assets** | $133,000 | $365,000 |
| **Property Plant & Equipment (net of depreciation** | $72,000 | $63,000 |
| **Investment in FAT Series A** | $1,500,000 | $1,500,000 |

| Preferred Stock | | |
|---|---|---|
| Loan to shareholder (WIEDERHORN) | $9,155,000 | $16,803,000 |
| Other Assets | $0 | $56,000 |
| Total Assets | $10,860,000 | $18,787,000 |

| Year | December 30, 2018 | December 29, 2019 |
|---|---|---|
| Total Current Liabilities | $24,127,000 | $25,742,000 |
| Due to FAT | $15,514,000 | $25,967,000 |
| Other | $58,000 | $56,000 |
| Total Liabilities | $39,699,000 | $51,765,000 |

b.   The only apparent source of funds available to FOG CUTTER to repay the purported loans from FAT would therefore have been the sale of the shares it held in FAT itself.

c.   But on the Q1 2020 FAT earnings call, WIEDERHORN emphasized the importance of FOG CUTTER retaining its over 80% ownership of FAT to preserve FOG CUTTER's net operating loss to shelter FAT's taxable income.

3.   WIEDERHORN Used Funds Derived from FAT to Pay for His Lavish Lifestyle

a.   *WIEDERHORN and THAYER's Use of PayPal and Abuse of Credit Cards Ultimately Paid for by FAT BRANDS to Generate Improper and Undisclosed Personal Wealth and Benefits*

27.  As noted above, from my review of financial records, and for the following additional reasons, I believe WIEDERHORN converted corporate funds of FAT and its affiliates to pay

credit card bills incurred primarily for WIEDERHORN's undisclosed and improper personal benefit:

     a.  American Express issued a FAT corporate card ending 4-11000 to WIEDERHORN ("WIEDERHORN FAT Card") as early as November 2017.  AMEX also issued the WIEDERHORN Centurion Card to WIEDERHORN as early as October 2017.

     b.  Between on or about October 28, 2017, and May 24, 2019, the WIEDERHORN FAT Card (including sub-accounts) and the WIEDERHORN Centurion Card incurred hundreds of charges for "PROFESSIONAL SERVIC[ES]" totaling more than $8 million to a PayPal account in the name of "TWIEDERH."  Based on my review of PayPal records, the "TWIEDERH" PayPal account was registered to THAYER in 2009. The balances on the American Express cards that incurred the PayPal charges were primarily paid from bank accounts in the names of FAT or FAT subsidiaries.

     c.  WIEDERHORN received millions of American Express reward points for the millions of dollars of American Express charges generated in connection with the funds sent to and through the TWIEDERH PayPal account.

     d.  Additional documents obtained from Bank of America during the course of this investigation support the inference that WIEDERHORN was also using a Bank of America credit card to further his PayPal-related round-trip scheme:

     i.  On or around March 14, 2019, WIEDERHORN obtained a Bank of America FAT commercial credit card, account ending in 2788 ("WIEDERHORN Bank of America card"), in WIEDERHORN's name.  I reviewed the WIEDERHORN Bank of America

Card records for the period from about March 14, 2019, to about April 30, 2020.  During this period, there were dozens of charges totaling more than $500,000 reflecting payments to THAYER's PayPal account.  The balances resulting from these charges were paid primarily from a Mechanics Bank account ending in 8955 in the name of a FAT subsidiary, Bonanza Restaurant Company LLC.

      e.   In total, between approximately October 20, 2017 and January 1, 2020, the WIEDERHORN FAT Card, WIEDERHORN Centurion Card, and WIEDERHORN Bank of America Card collectively sent millions of dollars to THAYER's PayPal Account.  These funds traveled from THAYER's PayPal account to THAYER'S Bank of America personal checking and savings accounts, ending in 9706 and 8080, respectively (collectively, the "THAYER Bank of America Accounts").  Thereafter, almost all of those funds were then transferred from the THAYER Bank of America Accounts back to bank accounts in the name of FAT or FAT's subsidiaries, thus completing the "round trip" aspect of these transactions.

      f.   During the period of approximately October 20, 2017, through April 30, 2020, these PayPal transactions amounted to over $9 million in transactions, for which more than $250,000 in transaction fees were paid to PayPal.

      g.   Because PayPal received more than $250,000 in transaction fees out of the approximately $9 million that otherwise traveled in a "round trip" from WIEDERHORN-controlled corporate entities to THAYER's accounts and then back to WIEDERHORN-controlled corporate entities, I believe WIEDERHORN's

PayPal scheme caused those entities to expend at least approximately $250,000 in corporate funds for no legitimate corporate purpose but, instead, to be spent to further WIEDERHORN's fraudulent scheme to generate undisclosed compensation (in the form of credit-card points) for WIEDERHORN.

           *b.*    *WIEDERHORN and His Family's Use of Credit Cards for Personal Expenses Paid by FAT*

28.  As noted above, from my review of financial records, and for the following additional reasons, I believe WIEDERHORN converted corporate funds of FAT and its affiliates to pay credit-card bills incurred primarily for WIEDERHORN's undisclosed and improper personal benefit in the following additional ways:

        a.  Records for the WIEDERHORN Centurion Card between approximately October 28, 2017 and March 29, 2020 and WIEDERHORN's Bank of America Credit Card between approximately March 14, 2019 and April 30, 2020 demonstrate that WIEDERHORN utilized these cards for significant personal luxury expenses, including:

        i.  A $183,500 charge on the WIEDERHORN Centurion Card on or around July 17, 2018 from Graff Diamonds Limited ("Graff") in London, United Kingdom.  According to its website, Graff designs, manufactures, and retails jewelry products.

        ii. Charges totaling approximately $150,000 on the WIEDERHORN Centurion Card on or around June 9, 2018 from

Beverly Hills, California, which appear to reflect a down-payment for WIEDERHORN's purchase of a Rolls Royce.

        iii. Two charges on the WIEDERHORN Centurion Card for approximately $93,325 and $14,048 on or around June 20, 2018 and February 8, 2019, respectively, totaling approximately $103,373, from Jamra & Jamra LLP for "Legal Service." Grace Jamra, identified as an attorney on Jamra & Jamra LLP's website, was listed as the attorney for WIEDERHORN on the public docket for his divorce action in Los Angeles Superior Court.

        iv. Three charges on the WIEDERHORN Centurion Card and one charge on the WIEDERHORN Bank of America Card for approximately $4,272 on or around December 19, 2017; $9,636 on or around February 9, 2019l; and $5,000 on or around April 4, 2019; and $20,000 on or around May 23, 2019, totaling approximately $38,908, from a jewelry shop in Beverly Hills, California known as XIV Karats Ltd.

        v. Numerous other charges for thousands of dollars from Dolce & Gabbana, Giorgio Armani Boutique, clothing retailer, Intermix-Robertson, and the upscale home-furnishings company, Restoration Hardware.

        b. During this time, i.e., between approximately October 28, 2017 and March 29, 2020, the WIEDERHORN Centurion Card was linked to additional authorized cardholders including Klepper; Tiffany; WIEDERHORN's six children; WIEDERHORN's mother, Peggy Wiederhorn; Anabel Lucas; and other of WIEDERHORN's personal household employees and associates. Review of the American Express Centurion records for

41

WIEDERHORN's family and associates reveals significant expenses, which appear to be personal in nature, including but not limited to doctor's bills, jewelry, exercise equipment, luxury clothing, shoes, hair and nail salons, mattresses, groceries, pet care, tutoring services, skin care products, and dry cleaning.  Some of the charges are by WIEDERHORN's family members or WIEDERHORN's associates who were not employees of FAT when the expenses were incurred.

   c.  Records from the WIEDERHORN FAT Card, the WIEDERHORN Centurion Card, and the WIEDERHORN Bank of America Card also show significant travel expenses for WIEDERHORN's family and associates. I believe these trips to be personal in nature due to the destinations, timing of the trips, and presence of non-FAT employees with close personal ties to WIEDERHORN. WIEDERHORN and his family utilized the credit cards to purchase flights to and/or from Aspen, Colorado; San Jose Del Cabo, Mexico; and Europe for themselves.  WIEDERHORN and his family also used the credit cards to pay for lodging, restaurants, and purchases at ski shops. For example:

    i.  On or around July 23, 2018, the WIEDERHORN Centurion Card incurred a charge for approximately $24,739 at Hotel Byblos in Saint-Tropez, France.

    ii. On or around July 26, 2018, the WIEDERHORN Centurion Card incurred a charge for approximately $29,913 for Hotel Arts Barcelona in Barcelona, Spain.

    iii. On or around November 19, 2018, the WIEDERHORN Centurion Card incurred a charge for approximately $38,726 for Montage Los Cabos.

   d. Based on my review of the transaction records, the WIEDERHORN Centurion Card balances (including for the sub-accounts in the names of WIEDERHORN's family member and associates) were paid primarily out of FAT or FAT subsidiary bank accounts.  For example, between approximately October 20, 2017 (the date of FAT's IPO) and May 13, 2019, over $5 million in payments were made to the WIEDERHORN Centurion Card from the 3478 FNA Mechanics Account.

### D. CONNECTIONS TO SUBJECT PREMISES

   1. SUBJECT PREMISES 1

  29. For reasons stated above, I believe that WIEDERHORN resides at SUBJECT PREMISES 1.  According to CalPrivate Bank's Customer Information Profile verified on August 19, 2020, WIEDERHORN's street address was SUBJECT PREMISES 1. According to CalPrivate Bank's Customer Information Profile verified on August 19, 2020, Klepper's street and mailing address was also SUBJECT PREMISES 1.  WIEDERHORN's Oregon driver's license also lists the address for SUBJECT PREMISES 1 as one of WIEDERHORN's residences.  And, as noted, I observed WIEDERHORN walking with dogs near SUBJECT PREMISES 1 on or around November 12, 2021.

   2. SUBJECT PREMISES 2

  30. According to law-enforcement database records reviewed in the course of this investigation, THAYER and his wife bought

SUBJECT PREMISES 2 in or around April 2021. According to the
California Department of Motor Vehicles, SUBJECT PREMISES 2 was
updated as THAYER's most recent mailing address as of August 2,
2021. And, as noted, I observed THAYER leaving SUBJECT PREMISES
2 on or around November 17, 2021.

31. According to government and property records reviewed
in the course of this investigation, THAYER bought PREMISES 2
in May 2021 and PREMISES 2 is THAYER's most recent mailing
address and residence.

**E.   TRAINING AND EXPERIENCE IN INVESTIGATING FINANCIAL
OFFENSES**

32. Based on my training and experience, and information
from other experienced investigators of fraud offenses, I know
the following:

a.   Individuals involved in fraud schemes often use
the proceeds of the fraud to purchase expensive items or store
the proceeds in the form of cash to make it more difficult to
trace.

b.   Typically, individuals involved in fraud schemes
maintain evidence where it is close at hand and safe, such as in
their residences, vehicles, and digital devices, which are also
commonly stored in their residences and vehicles.

i.   Indeed, in this case, WIEDERHORN and THAYER
appear to have made substantial use of digital devices in
furtherance of the scheme by electronic transfers and
transactions, and it seems unlikely they would have been able to
do so without the assistance of a computer or similar digital

device. I know that individuals who commit crimes with the aid of electronic devices do not readily discard them, as computers, tablets and cell phones are expensive items that are typically used for years before being upgraded or discarded. Computers, tablets and cell phones can be used to communicate between co-conspirators and may contain information relating to the crime under investigation. And, even when those who use digital devices to commit fraud do upgrade them, they often transfer data across devices, such as contact lists, email and text communications, and documentary records.

c.   Individuals involved in fraud frequently keep the most damaging evidence and/or proceeds of the scheme at their residences and in their vehicles to help conceal the fraud from third parties, such as coworkers who may have access to such documents at the workplace. Proceeds such as cash and gifts are easier to conceal at the fraudster's residence rather than in plain view of coworkers.

d.   More sophisticated criminals may rent public storage units, safe deposit boxes, or other third-party space to further distance themselves from incriminating evidence or to hide their illicit profits from law enforcement or civil litigants. Such individuals typically maintain items relating to those third-party locations at their homes, such as keys, addresses, and leasing documents.

33.   The requested search warrant seeks not only to seize evidence of crimes but also the "fruits of crime" and "property designed for use, intended for use, or used in committing a

crime." Fed. R. Crim. P. 41(c). Even long after a crime has been completed, the illicit proceeds of a crime often still exist, frequently secreted in forms or locations difficult to detect by law enforcement.

## F.    TRAINING AND EXPERIENCE ON DIGITAL DEVICES[16]

34.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

---

[16] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

35.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

e.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

f.   Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

36.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

g.   Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or

eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

h.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

i.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress WIEDERHORN and THAYER's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of WIEDERHORN and THAYER's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

37.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## V.  <u>CONCLUSION</u>

38.  For all the reasons described above, there is probable cause to believe that WIEDERHORN and THAYER have committed the SUBJECT OFFENSES, and that evidence, contraband, fruits, or instrumentalities of the SUBJECT OFFENSES, as described above and in Attachment B of this affidavit, will be found in a search of the SUBJECT PREMISES, as further described above and in Attachment A of this affidavit.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 29th day of
November, 2021.

_____
HONORABLE KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE

50